In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2052

ARTHUR L. LEWIS, JR., *et al.*,

*Plaintiffs-Appellees*,

*v.*

CITY OF CHICAGO, ILLINOIS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 5596—**Joan B. Gottschall**, *Judge*.

On Remand from the
Supreme Court of the United States

ARGUED MARCH 29, 2011—DECIDED MAY 13, 2011

Before EASTERBROOK, *Chief Judge*, and BAUER and POSNER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. In 1995 the City of Chicago gave a written examination for positions in its Fire Department. Applicants who scored 89 and up were rated highly qualified, while those who scored 64 and below

were rated not qualified. Those in between were rated qualified but were told in January 1996 that they were unlikely to be hired. (Applicants also were evaluated for physical skills, criminal records, and other attributes, but those do not matter to this litigation.) From May 1996 through November 2001, the City hired 11 groups of applicants from the well-qualified pool. Each time it chose at random from those who had scored 89 or better; it did not follow the common civil-service practice of hiring in rank order from a list.

In March 1997 a person in the qualified pool filed with the EEOC a charge of discrimination. This charge, the first to be filed, contended that the cutoff of 89 had a disparate impact on African-American applicants. After receiving right-to-sue letters from the agency, several applicants filed this class action in 1998. The district court concluded that the first charge was timely despite the fact that it came more than 300 days after members of the qualified pool learned that they were unlikely to be hired. The City conceded that the cutoff score created a disparate impact but contended that the selection criteria were "job related for the position in question and consistent with business necessity". 42 U.S.C. §2000e–2(k)(1)(A)(i). After a bench trial, the district court rejected the City's business-necessity defense. 2005 U.S. Dist. LEXIS 42544 (N.D. Ill. Mar. 22, 2005). Later it awarded relief that included the hiring of 132 class members and damages based on the loss-of-a-chance approach. 2007 U.S. Dist. LEXIS 24378 (N.D. Ill. Mar. 20, 2007). See *Doll v. Brown*, 75 F.3d 1200 (7th Cir. 1996).

Chicago's appeal raised only one question: Whether the March 1997 charge of discrimination was timely. We found that it was not, because it came more than 300 days after applicants in the qualified pool learned not only that the exam had a disparate impact but also that they were unlikely to be hired. 528 F.3d 488 (7th Cir. 2008). The Supreme Court reversed in turn, holding that in disparate-impact litigation the time starts anew whenever the employer uses a test (or other practice) to make hiring decisions. 130 S. Ct. 2191 (2010). This made the March 1997 charge timely with respect to each wave of hiring other than the first.

The Justices identified two subjects potentially requiring attention on remand. One is whether Chicago has preserved its contention that the charge of discrimination was untimely with respect to the first hiring class. The other is whether Chicago has preserved an argument that the plaintiffs failed to prove that any given use of the cutoff score had a disparate impact—and, if yes, whether that argument carries the day. We asked the parties to file briefs on those topics and held oral argument to explore them.

The City preserved its position on both issues. Its initial appellate brief contested the district judge's conclusion that the first charge was timely; that subsumed a challenge to the ruling that the charge was timely with respect to the first batch of hires in particular. The district judge used a continuing-violation approach that lumped all hires together. After our initial decision, plaintiffs abandoned that approach, which was incom-

patible with *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Because the district court, at plaintiffs' urging, had treated all waves of hiring alike, the City did not need to make separate arguments concerning each wave to benefit from the Supreme Court's conclusion that each "use" of a practice must be analyzed separately. And if, by treating all hires alike in the district court, plaintiffs have failed to establish that any given use of the hiring criteria created a disparate impact, then the City is entitled to judgment in its favor. Litigants need not anticipate, on pain of forfeiture, arguments never made until late in the litigation (in this case, until proceedings had reached the Supreme Court).

This means that the judgment must be reversed to the extent that the district court granted relief arising from the first set of hires from the list. The charge came too late to contest these employment decisions, as the Supreme Court stated. 130 S. Ct. at 2198. This is the only relief to which the City is entitled, however. Although it has preserved a contention that plaintiffs failed to establish a disparate impact in any particular use of the list, that contention is substantively unavailing.

Recall that the City *conceded* in the district court that the cutoff score of 89 had a disparate impact on minority applicants. The only issue contested at trial was whether the test and its cutoff score were job-related and consistent with business necessity. Because Chicago selected at random from the well-qualified group (those with scores of 89 and up), each batch of hires created the same disparate impact as the overall list. This means

that each use of the test was equally vulnerable to plaintiffs' challenge; there was no difference between contesting the list as a whole (plaintiffs' actual strategy) and contesting each use of the list (the approach appropriate under the Supreme Court's decision).

We grant the possibility that, by chance, one batch or another would not create a disparate impact; indeed, it is possible that chance would produce a batch in which minority applicants predominated. But the City does not say that this occurred, and the law of large numbers is against it. Moreover, because the City hired from the well-qualified pool until it was exhausted, the 10 properly challenged "uses" as a whole matched the pool and had the same disparate impact. If one or more of the 10 contested hiring classes departed materially from what a random draw would be expected to produce, the City should have pointed this out; it never did, so plaintiffs are entitled to the natural inference that all classes were alike.

If the City had hired in rank order, as many civil-service employers do, things would have been different. Suppose applicants who got 100 had been hired in May 1996, those who got 99 four months later, those with scores of 98 four months after that, and so on. Then it would have been essential for plaintiffs and the district court to evaluate each use of the list separately. For it is possible that some of these uses would not have produced a disparate impact—and, if any given band of scores had an adverse effect on minority applicants, it might have been easier for the employer to

justify the practice. Perhaps it would have been "consistent with business necessity" to hire those who scored 100 ahead of those who scored 85, even if it was not necessary to hire those who scored 90 ahead of those who scored 88. But Chicago did not hire new firefighters in rank order. Everyone who scored 89 and up was treated alike; everyone who scored 65 to 88 was treated alike. The City conceded that this difference created a disparate impact. The district judge found that the cutoff at 89 was not justified, and the City did not appeal that conclusion. The City's concession plus the district court's uncontested findings establish all that is required for the plaintiffs to prevail on the merits.

Not so, Chicago contends. It observes that the first charge was filed more than 300 days after the decision to adopt the cutoff score of 89. This means, the City maintains, that it was entitled to treat the highly qualified pool (generated by applying the cutoff score to the full list) as lawful. And if that pool was lawful, then each use of it to hire a class of firefighters must have been lawful, the argument concludes. The premise is correct; delay in filing the charge meant that the highly qualified pool is beyond legal challenge. The Supreme Court said so, 130 S. Ct. at 2198–99, as our 2008 decision also had done. 528 F.3d at 490–91. But the conclusion does not follow, because under the Supreme Court's analysis the question is not whether a list, test, or criterion is lawful, but whether each *use* to which it is put was justified under the criteria in §2000e–2(k)(1)(A)(i).

Relying on *United Air Lines, Inc. v. Evans*, 431 U.S. 553 (1977), and similar decisions, the City argued to the

Supreme Court that, if delay in filing a charge of discrimi-
nation entitles the employer to treat bygones as lawful,
then the current effects of these bygones must be lawful
too. Compare *Ledbetter v. Goodyear Tire & Rubber Co.*, 550
U.S. 618 (2007), *Lorance v. AT&T Technologies, Inc.*, 490 U.S.
900 (1989), and *Delaware State College v. Ricks*, 449 U.S. 250
(1980), with *Bazemore v. Friday*, 478 U.S. 385 (1986).
The Justices replied (130 S. Ct. at 2199):

> We disagree. As relevant here, those cases estab-
> lish only that a Title VII plaintiff must show a
> "present violation" within the limitations period.
> *Evans, supra*, at 558 (emphasis deleted). What that
> requires depends on the claim asserted. For
> disparate-treatment claims—and others for which
> discriminatory intent is required—that means the
> plaintiff must demonstrate deliberate discrimina-
> tion within the limitations period. See *Ledbetter,
> supra*, at 624–629; *Lorance, supra*, at 904–905; *Ricks,
> supra*, at 256–258; *Evans, supra*, at 557–560; see
> also *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (per
> curiam). But for claims that do not require dis-
> criminatory intent, no such demonstration is
> needed. Cf. *Ledbetter, supra*, at 640; *Lorance, supra*,
> at 904, 908–909. Our opinions, it is true, described
> the harms of which the unsuccessful plaintiffs
> in those cases complained as "present effect[s]" of
> past discrimination. *Ledbetter, supra*, at 628; see
> also *Lorance, supra*, at 907; *Chardon, supra*, at 8;
> *Ricks, supra*, at 258; *Evans, supra*, at 558. But the
> reason they could not be the present effects of
> present discrimination was that the charged dis-

crimination required proof of discriminatory intent, which had not even been alleged. That reasoning has no application when, as here, the charge is disparate impact, which does not require discriminatory intent.

In disparate-impact litigation the question is not whether a given test or standard is lawful standing alone, but whether its application has been adequately justified. In other words, it is the *application* ("use") of a test or standard that Title VII places at issue. To say that the highly qualified pool was lawfully composed does not imply that it was lawful for the employer to hire *exclusively* from that pool.

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), the first disparate-impact case, did not ask whether the employer's requirement that applicants possess high-school diplomas—a requirement that disproportionately disqualified minority applicants—was "lawful." Plainly it was; no rule of law proscribes race-neutral educational prerequisites. Nor did the Court ask whether a charge of discrimination had been filed within 300 days after Duke Power first rejected an applicant who had not finished twelfth grade. The Court asked whether the employer had justified using a requirement that filtered out minority applicants. It concluded that the high-school-diploma requirement had been used to produce an unlawfully discriminatory outcome for a particular category of jobs, not that the requirement itself was "unlawful" in all circumstances. Whether a practice has been adequately justified is the question that §2000e–2(k)(1)(A)(i),

which codifies *Griggs*, posed in this litigation. This is why it does not matter whether the City is entitled to treat the well-qualified pool as lawful in the abstract.

The judgment of the district court is affirmed, except with respect to the remedy based on the first batch of hires. The case is remanded with instructions to modify the remedy to eliminate any relief based on the hires of May 1996.